# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### DELTA DIVISION

**KELLY MCNEAL, et al.**                                     **PLAINTIFFS**

**V.**                                              **NO. 2:70-CV-00029-DMB**

**TATE COUNTY SCHOOL**
**DISTRICT, et al.**                                        **DEFENDANTS**


## MEMORANDUM OPINION AND ORDER

This school desegregation case is before the Court on: (1) the plaintiffs' "Motion for Supplemental Relief Pursuant to Desegregation Order, and to Compel Defendants to File Supplemental Reports Report [sic] That Are in Compliance with the August 4, 1970 Desegregation Order," Doc. #48; (2) the plaintiffs' "Motion for Further Relief Pursuant to Desegregation Order, and to Compel Defendants to Reinstitute Sports and Extracurricular Activities at Coldwater Attendance Center High School," Doc. #57; and (3) the Tate County School District's motion to strike, Doc. #89.

## I
## Procedural History

### A. Initiation of This Action and Initial Desegregation Order

On April 27, 1970, Jeffie McNeal and other individual plaintiffs filed a complaint on behalf of their children, also named in the complaint, alleging that the Tate County School District ("District") and its Board of Education were operating an unconstitutional dual education system. The same plaintiffs filed an amended complaint with the same substantive allegations on June 8, 1970.

On August 4, 1970, United States District Judge Orma R. Smith entered an order enjoining the District from operating a dual system and directing the operation of a "unitary

school system as required by the Supreme Court of the United States ...." Doc. #13-1 at 1. To this end, Judge Smith directed that attendance in the District's schools be determined by the assignment of students to three zones: "Easterly," "Northwesterly," and "Southwesterly." *Id*. at 2–3. The order also called for the filing of regular reports to include, among other things, the race and number of teachers in the District and "a brief description of any present or proposed construction or expansion of facilities." *Id*. at 9.

Over the ensuing five years, the District, employing methods such as ability grouping and the sale of a school to a private institution, unsuccessfully attempted to circumvent the requirements of the injunction. *See McNeal v. Tate Cty. Sch. Dist.*, 460 F.2d 568, 572 (5th Cir. 1971); *McNeal v. Tate Cty. Sch. Dist.*, 508 F.2d 1017 (5th Cir. 1975). On July 11, 1975, Judge Smith entered a memorandum opinion and order stating that "[m]aterial progress must be made in the elimination of all-black grade-sections if the school district is to avoid the imposition of an at random assignment of students." *McNeal v. Tate Cty. Sch. Dist.*, No. DC 70-29-S, 1975 WL 175356, at *3 (N.D. Miss. July 11, 1975). Approximately one year later, on July 16, 1976, Solomon Osborne entered a notice of appearance as counsel for the plaintiffs. Doc. #1 at 5. Following Osborne's notice of appearance, this case lay largely dormant for more than thirty years.[1] *See id*. at 5–6.

### B. 2010 Redrawing of Attendance Lines

On August 9, 2010, the District filed a motion to redraw the three attendance zones created by Judge Smith. Doc. #3. On September 3, 2010, this case was reassigned to United States District Judge W. Allen Pepper. Judge Pepper, noting the absence of an objection from the plaintiffs, granted the District's motion on September 28, 2010. Doc. #4. Pursuant to Judge

---

[1] During this period, the District filed annual reports and a motion to change a school site, which was granted.

Pepper's order, and of relevance here, students residing in the Easterly Zone were assigned to Independence High School; students residing in the Northwesterly Zone were assigned to Coldwater High School; and students residing in the Southwesterly Zone were assigned to Strayhorn High School. *Id*. at 2–3.

### C. Request to Close Coldwater High School and Reporting-Related Motions

Following Judge Pepper's September 2010 order, except for the continued filing of annual reports, this case remained inactive until April 1, 2016, when the District filed a motion to modify the attendance zone lines. Doc. #12. In its motion, the District asks the Court to modify the orders of Judge Smith and Judge Pepper to: (1) close Coldwater High School; and (2) modify the Northwesterly Zone to send some of its students to Independence High School and the remaining students to Strayhorn High School. *Id*. This case was reassigned to the undersigned district judge on April 4, 2016. Approximately one month later, on May 11, 2016, the District filed a motion seeking expedited review of its motion to modify. Doc. #17.

On May 18, 2016, a group of parents of students in the District filed a motion to be substituted as plaintiffs in this action. Doc. #20. On June 14, 2016, this Court entered an order granting the motion to substitute and requesting additional information on the District's motion to modify the desegregation plan. Doc. #33. With regard to the District's motion to expedite, the order stated that the Court would "endeavor to resolve this matter as expeditiously as possible." *Id*. at 8.

On June 23, 2016, the plaintiffs filed a "Motion for Relief Pursuant to Desegregation Order, for Discovery, to Compel Defendants to File Complete Mandated Reports and to Comply with the Requirements of the August 4, 1970 Desegregation Order" ("Omnibus Motion"). Doc. #37. In the motion, the plaintiffs alleged, among other things, that the District had filed years of

annual reports omitting required information regarding teachers in the District. *Id.* The plaintiffs requested that the time for filing their response to the District's motion to modify be extended until the District provided such information.

In response to the Omnibus Motion, the District filed a supplemental report conceding that the required data showing the number of teachers by race at each school in the District "has not been submitted since 2000." Doc. #38. The supplemental report purports to provide this data "for years 2010-2011 through 2015-2016" based on data "readily available" to the District. *Id.*; Doc. #38-1. The District represents in its supplemental report that it "is still compiling data pre-2010 and will seasonably supplement this report once it obtains same." Doc. #38.

On June 28, 2016, this Court entered an order granting in part and deferring in part the Omnibus Motion. Doc. #39. The Court stayed the plaintiffs' deadline to respond to the motion to modify because "information about the number of teachers by race is necessary for Plaintiffs to respond to statements made by the District in its supplemental brief in support of its motion to modify the attendance zone lines (statements included at the Court's direction) regarding faculty and staff in the District's schools." Further, the order directed the District to show cause why it should not be sanctioned for its years of non-compliance with the desegregation order's mandate to report the number of teachers by race for each school in the District.

The District responded to the order to show cause on July 5, 2016. Doc. #41. Six days later, on July 11, 2016, the District moved to strike the Omnibus Motion. Doc. #43. The same day, the District responded in opposition to the Omnibus Motion. Doc. #45.

On July 20, 2016, the plaintiffs filed a "Motion for Supplemental Relief Pursuant to Desegregation Order, and to Compel Defendants to File Supplemental Reports Report [sic] That Are in Compliance with the August 4, 1970 Desegregation Order" ("Reporting Motion"). Doc.

#48. The District responded to the Reporting Motion on July 25, 2016. Doc. #50. In the memorandum accompanying its response, the District represents that it had "reviewed its records regarding construction and the only year that construction was not reported was 2004." Doc. #51 at 6.

The plaintiffs responded in opposition to the District's motion to strike on July 27, 2016, Doc. #54; but did not file a reply in support of the Omnibus Motion. The District replied in support of its motion to strike on August 8, 2016. Doc. #56.

### D. Extracurricular Motion and Evidentiary Hearing

On September 30, 2016, the plaintiffs filed a "Motion for Further Relief Pursuant to Desegregation Order, and to Compel Defendants to Reinstitute Sports and Extracurricular Activities at Coldwater Attendance Center High School" ("Extracurricular Motion"). Doc. #57. The motion and accompanying memorandum brief, which are supported by numerous affidavits, represent that, at the beginning of the 2016-2017 academic year, students at Coldwater Attendance Center High School were informed "that interscholastic sports extracurricular activities would no longer be available to students attending Coldwater … [and that] Coldwater students desiring to participate in interscholastic sports … would have to transfer to Strayhorn High School or to Independence High School." Doc. #58 at 2. The plaintiffs seek: (1) "an immediate order … compelling the Defendants to reinstitute interscholastic sports and extracurricular activities at Coldwater;" (2) "that this Court find defendants in civil contempt for violating the terms of the 1970 Desegregation Order;" (3) an order "dismissing Defendants' Motion to Modify Attendance Zone Lines without prejudice;" and (4) "an order … grant[ing] the Plaintiffs reasonable attorney fees, costs, and the expenses of preparing and filing this Motion." Doc. #57 at ¶¶ 9–12. The District responded in opposition to the Extracurricular Motion on

October 11, 2016, and the plaintiffs timely replied. Doc. #66; Doc. #71; Doc. #69. In their reply, the plaintiffs assert that the District further violated the 1970 order's reporting requirements by failing to report the construction of Strayhorn and Independence High Schools and other "facilities expansions." The plaintiffs again argue that the District should be held in civil contempt for these violations.

The Court convened an evidentiary hearing on the Extracurricular Motion on October 17, 2016. Doc. #73. In their opening evidence, the plaintiffs presented testimony from numerous current and former Coldwater students. In response, the District called District Superintendent Daryl Scoggin and the Executive Director of the Mississippi High School Activities Association ("MHSAA"), Don Hinton. The District introduced three exhibits: (1) a January 28, 2016, letter from Scoggin to Hinton; (2) a tryout form for the Strayhorn High School basketball team provided to Coldwater students; and (3) a transfer request form provided to Coldwater students. In rebuttal, the plaintiffs called Carolyn Shead, a member of the Tate County School Board.

### E. Post-Hearing Filings

Approximately two weeks later, on November 1, 2016, the Court entered an order directing the District to show cause why it should not be sanctioned for failing to report the construction of Strayhorn and Independence High Schools. Doc. #78. The order granted the plaintiffs until November 7, 2016, to bring to the Court other "specific instances of reporting failures," and allowed the District until November 14, 2016, to respond to any additional allegations of misconduct. *Id*. at 2 n.3.

On November 4, 2016, the District responded to the order to show cause. Doc. #79. Four days later, on November 8, 2016, the plaintiffs filed a "Reply to Defendants' Response to Order to Show Cause." Doc. #83. The plaintiffs' reply asserts that, "as shown by Exhibits

attached to the Plaintiffs' memorandum … Defendants have failed to report numerous expansions renovations and construction of facilities to the Court, down through the years." *Id.* at ¶ 4. On November 10, 2016, the plaintiffs filed a memorandum in support of their reply, which includes specific allegations, supported by evidence, of additional reporting violations by the District.[2] Doc. #84. The same day, this Court entered an order denying the District's motion to strike and granting in part the deferred portion of the Omnibus Motion. Doc. #85. The order also set a discovery schedule regarding the District's motion to modify. *Id.*

On November 16, 2016, the Court issued an order directing the District to show cause why it should not be sanctioned for the alleged reporting violations identified in the plaintiffs' November 10, 2016, memorandum, and why it and its counsel[3] should not be sanctioned for the related apparent misrepresentation in its July 25 filing that "the only year that construction was not reported was 2004." Doc. #86.

On November 28, 2016, the District responded to the order to show cause.[4] Doc. #87. The same day, the District moved to strike certain exhibits attached to the plaintiffs' November 10 memorandum. Doc. #89.[5]

---

[2] The Court notes that the plaintiffs filed their memorandum setting forth the additional reporting violations three days after the deadline imposed by this Court. While the Court does not approve of the tardiness, it will, in the interest of enforcing its orders, consider the allegations in the memorandum.

[3] The issue of Rule 11 sanctions with respect to the District's counsel will not be addressed in this order.

[4] Though the District's filing does not specify whether it is in response is to the November 1 show cause order, the November 16 show cause order, or both, based on its substance, the response appears to address both.

[5] The Court notes that a number of the District's filings include certificates of service reflecting service only on "Honorable Minnie P. Howard" at "North Mississippi Rural Legal Service." *E.g.*, Doc. #82 at 2; Doc. #87 at 6; Doc. #90 at 2. This presumptively violates the requirement of Federal Rule of Civil Procedure 5(b)(1) that service be made on a party's attorney if that party is represented by an attorney. The District's counsel is reminded that Solomon Osborne is counsel of record for the plaintiffs and should be listed on all of the District's certificates of service unless and until he is no longer counsel of record for the plaintiffs.

## II
## District's November 28 Motion to Strike

In its motion to strike, the District argues that three exhibits attached to the plaintiffs' November 10 memorandum must be stricken because: (1) the documents were produced by a private accounting firm, not a state auditor, as represented by the plaintiffs; and (2) "[t]he reports are … not certified or authenticated in any way according to the Federal Rules of Evidence, particularly Rule 902 …."

As an initial matter, the District cites no authority, and this Court is aware of none, which stands for the proposition that a financial audit should be stricken because it was prepared by a private accounting firm. The documents will not be stricken for this reason.

Turning to the issue of authentication, "[a]uthentication … represent[s] a special aspect of relevancy…. This requirement of showing authenticity falls … in the category of relevancy dependent upon fulfillment of a condition of fact …." *In re Bobby Boggs, Inc.*, 819 F.2d 574, 580 (5th Cir. 1987) (quoting Fed. R. Evid. 901(a) advisory committee's note). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims." Fed. R. Evid. 901(a). Evidence may be authenticated by its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). In making this determination, a court may consider whether a challenged document "is consistent with other pieces of admissible evidence." *In re McLain*, 516 F.3d 301, 309 (5th Cir. 2008).

Here, the exhibits at issue are: (1) a document titled "Tate County School District Financial Statements June 30, 2005," Doc. #84-2; (2) a document titled "Tate County School District Audited Financial Statements June 30, 2006," Doc. #84-3; and (3) a document titled

"Tate County School District Audited Financial Statements for the Year Ended June 30, 2011,"
Doc. #84-4. These documents all include the seal of the Office of the State Auditor for
Mississippi above the following disclaimer:

> The following document was not prepared by the Office of the State Auditor, but
> was prepared by and submitted to the Office of the State Auditor by a private
> CPA firm. The document was placed on this web page as it was submitted. The
> Office of the State Auditor assumes no responsibility for its content or for any
> errors located in the document. Any questions of accuracy or authenticity
> concerning this document should be submitted to the CPA firm that prepared the
> document. The name and address of the CPA firm appears in the document.

Doc. #84-2 at 1; Doc. #84-3 at 1; Doc. #84-4 at 1.

In considering the authenticity of the challenged documents, the Court first takes judicial
notice of the fact that full versions of each of the submitted documents are available on the State
Auditor's website. *See Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (en banc) ("[W]e
fail to see any merit to an objection to the panel taking judicial notice of the state agency's own
website."). Second, in responding to the order to show cause, the District submitted an affidavit
from its superintendent, Daryl Scoggin, which confirms the accuracy of information included in
the various reports and refers to such documents as "State Auditor report[s]." *See* Doc. #87-2.
Scoggin's affidavit, combined with the presence of the documents on the State Auditor's
website, convinces the Court that the documents are what they purport to be—audits of the
District's financials for the identified years. Accordingly, the District's authenticity objection is
overruled.

Because both of the District's arguments to strike the documents are without merit, the
motion to strike will be denied.

**III**
**Factual Background**

**A.  The District's High Schools**

As explained above, there are three public high schools in the District:  (1) Coldwater High School; (2) Strayhorn High School; and (3) Independence High School.  Coldwater High School is located in the middle of the District, approximately fourteen miles northwest of Strayhorn High School, and fourteen miles due west of Independence High School.  For the 2015–2016 academic year:  (1) Coldwater High had a grade 9–12 enrollment of 128 students, of which 84.4% were African American, 13.3% were white, and 2.3% were students of other races; (2) Strayhorn High had a grade 9–12 enrollment of 254 students, of which 14.2% were African American, 81.1% were white, and 4.7% were students of other races; and (3) Independence High had a grade 9–12 enrollment of 396 students, of which 34.1% were African American, 61.3% were white, and 4.3% were students of other races.

**B.  Construction and Reporting**

According to the affidavit of John T. Lamar, Jr.,[6] one of the District's attorneys of record, on January 3, 2000, the District assigned to Pansy Ray, a District employee, the responsibility of "gathering and filing the information for the Consent Report."  Doc. #41-1.  From 2000 on, in violation of the 1970 desegregation order, the annual reports omitted information regarding teacher demographics.  *Id.*  Also in violation of the 1970 order, the reports omitted information about the constructions of Independence High and Strayhorn High from 2004 until 2006.  Additionally, in 2012, the District performed "roof work" at Senatobia-Tate Career Center and

---

[6] Lamar states in his affidavit that he served as School Board Attorney from January 7, 2008, "until the firm was hired to represent the District on July 1, 2013."  Although he attests to matters "[f]rom 2000 on," he does not indicate the foundational basis for his knowledge of matters before January 7, 2008.

10

replaced a canopy at East Tate Elementary School but did not mention either project in its annual reports. Doc. #87-4.

## C. Scoggin Hire and Vote to Close Coldwater

On July 1, 2015, Scoggin assumed the office of Superintendent for the District. At the time he began his tenure, Scoggin, who had worked in education for approximately thirty-five years, was generally aware of the 1970 desegregation order in this case, and believed "that it was basically the same as it was when [he] was going to school [in Mississippi]." In this regard, Scoggin assumed "we were under an order to desegregate and try to make all of the schools as desegregated as possible."

During the first few months of his employment, Scoggin reviewed the enrollment and budgetary figures of the District's three high schools. On or about October 2015, Scoggin obtained a copy of the 1970 desegregation order. Scoggin "read [a] piece of" the desegregation order but did not read it in full because his copy "was on an older type fax paper that was very blurred ...."[7]

In November 2015, Scoggin and the School Board voted to close Coldwater High. According to Scoggin, the decision was motivated by Coldwater's "lack of involvement, the low attendance, the amount of money that we were expending there," low academic achievement, and difficulty recruiting faculty.

## D. Termination of Sports Teams

In the middle of January 2016, following the November 2015 decision to close Coldwater High, Scoggin called Don Hinton at MHSAA and informed him that the District would be

---

[7] Notably, Scoggins did not request a better copy or seek additional information from anyone.

closing Coldwater and that the school "would not be participating in sports ...." Approximately two weeks later, on January 28, 2016, Scoggin sent Hinton a letter stating:

> I am writing to officially inform the MHSAA that Coldwater Attendance Center grades 9-12 has been consolidated by the Tate County School Board at their November 2015 meeting. We have notified all schools affected that we will no longer field teams in any sport. Coldwater will become a k-8 school and will field teams at the Middle/Junior High level.

Doc. #70 at Ex. 1. Scoggin testified that at the time he wrote Hinton, he did not "have a complete understanding" of the need for court approval of the closure.

The following month, the MHSAA approved the request to withdraw from the MHSAA. According to Scoggin, withdrawal before August 2016 was necessary for Coldwater to avoid penalties for late cancellations.[8] Scoggin estimated that, had Coldwater not withdrawn before August, it could have faced a total penalty of approximately $20,000.

In early spring 2016, despite the absence of Court approval, District officials developed an attendance zone plan for closing Coldwater High School. After selecting a plan, the District notified the schools and students which students would be attending which schools. Information regarding athletic opportunities at Strayhorn and Independence was disseminated to Coldwater students through "school level meetings" with principals, counselors, and coaches.

As mentioned above, the District first sought leave from the Court to modify its attendance zones on April 1, 2016. Doc. #12. In mid-May 2016, the District informed students at Coldwater that they could try out for sports teams and the band at their newly-assigned school. While students at Coldwater had the option to remain at Coldwater but play at another school, the District did not make a public announcement regarding the availability of this option.

---

[8] There is no dispute that, at the time Coldwater High withdrew, the sports schedules for the 2016-2017 academic year had already been set by the MHSAA.

At the close of the 2015–2016 academic year, Strayhorn High and Independence High had twelve sports teams each while Coldwater High had six:  football, boys and girls basketball, softball, baseball, and track.

## E.  Planning for 2016-2017 Academic Year

In June or July 2016, around the time the plaintiffs filed the Omnibus Motion, Scoggin and his "leadership team" began developing a plan for keeping Coldwater High open in the event the Court denied or did not rule on the motion to modify.  Under this plan, minority students at Coldwater would be allowed to transfer under the District's majority-to-minority transfer program while non-minority Coldwater High students were informed they could stay enrolled at Coldwater but play sports at Independence High or Strayhorn High.

From minority students, the District received sixteen requests to transfer to Independence High School and twenty-six requests to transfer to Strayhorn.  The District approved eleven of the Independence High transfer requests and nineteen of the Strayhorn High requests.  A handful of non-minority students who could not transfer elected to play sports at Strayhorn High or Independence High.

## F.  2016-2017 Academic Year

Coldwater High opened in August for the 2016–2017 academic year, with no athletics or other extracurricular activities.  According to Scoggin, the decision to cancel non-athletic extracurricular activities was made by Coldwater High officials without School Board approval or knowledge.  However, School Board member Shead testified that, at a school board meeting in August 2016, Scoggin informed the School Board that "there would be no extracurricular activities" at Coldwater.  For his part, Scoggin testified that he learned of the cancelation of non-athletic extracurricular activities in early October or late September, a couple of weeks before the

hearing on the Extracurricular Motion, and received assurances from the principal "that if anything else like that had happened … it would be set straight." Scoggin did not, however, direct the reinstatement of the non-athletic extracurricular activities.

At the October 17 hearing, numerous Coldwater students testified that they wanted to participate in extracurricular activities at Coldwater but were unable to do so.[9] When asked if they would be interested in participating in the activities at one of the other schools in the District, most students said they would not. Other students testified that they had transferred, or were planning to transfer, in order to participate in athletic extracurricular activities.

# IV
## Merits of Extracurricular Motion

In the Extracurricular Motion, the plaintiffs request "an immediate order from this Court compelling the Defendants to reinstitute interscholastic sports and extracurricular activities at Coldwater Attendance Center High School." Doc. #57 at ¶ 9. Additionally, the plaintiffs ask for civil contempt sanctions for the cancelation of extracurricular activities and "engaging in a pattern of … violating this Court's orders" in the form of: (1) dismissal of the motion to modify; (2) costs and attorney's fees; and (3) an order "requiring the Defendants to immediately reinstate interscholastic Sports and extracurricular activities." *Id*. at ¶¶10–13.

### A. Authority to Enjoin

In desegregation cases, a court may issue an injunction when the conduct to be enjoined violates the Constitution. *Bd. of Educ. of Okla. City Pub. Schs., Indep. Sch. Dist. No. 89 v. Dowell*, 489 U.S. 237, 248 (1991) ("The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by the local

---

[9] Students also testified regarding the unavailability of certain classes at Coldwater High. Scoggin explained that the availability of classes is a product of Coldwater High's block scheduling and that all students would have access to required courses by the end of the year.

authorities."). Moreover, a court has the inherent power to enjoin conduct interfering with the proper execution of a lawful desegregation order. *Augustus v. Sch. Bd. of Escambia Cty.*, 507 F.2d 152, 156 (5th Cir. 1975) ("The desegregation order is … within the jurisdiction of the court and the court may enter an injunction against any individual who interferes with the proper execution of that order."). In exercising its powers to grant injunctive relief, a court "should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. Bd. of Sch. Comm'rs of Mobile Cty.*, 402 U.S. 33, 37 (1971). Accordingly, where an injunction is sought in a desegregation case, a court must ask whether the action to be enjoined "reduce[s] desegregation or reinforce[s] the existence of a dual system,"[10] *United States v. Texas*, 457 F.3d 472, 478 (5th Cir. 2006); or violates an order of the Court, *Augustus*, 507 F.2d at 156. If injunctive relief is appropriate, the Court should choose relief that achieves the greatest degree of practicable desegregation.

### 1. Need for Injunction

The availability of extracurricular activities is one of the six factors identified by the United States Supreme Court in *Green v. County School Board* for determining whether a school district has eliminated the vestiges of a prior dual school system to the extent practicable. 391 U.S. 430, 435 (1968). In addressing this factor, courts ask primarily whether "all extracurricular activities are available to all students within the School District regardless of race." *Singleton v. Jackson Mun. Separate Sch. Dist.*, 541 F.Supp. 904, 908 (S.D. Miss. 1981). The desegregation order in this case employs a similar standard. *See* Doc. #23-1 at 7–8 ("No student shall be segregated or discriminated against on account of race or color, in any ... program (including ... athletics, or other extracurricular activity) that may be conducted or sponsored by the school in

---

[10] Additionally, a court has the inherent power to enforce the terms of its orders. *Augustus*, 507 F.2d at 156.

which the student is enrolled ….").  Accordingly, the requested injunction, whether sought under the 1970 desegregation order or this Court's broader injunctive authority, requires a determination of whether the cancelation of the extracurricular programs at Coldwater High School amounts to racial segregation or discrimination in the offering of extracurricular activities.

While, in some circumstances, the elimination of invidious racial distinctions may be sufficient to achieve desegregation in extracurricular activities, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 18 (1971); in evaluating whether extracurricular activities have been desegregated, courts have considered the existence of: (1) facially race-neutral barriers to participation;[11] and (2) "equality of financial support given to extracurricular activities at different schools and integration of those activities."[12]

In this case, the record shows that students at Coldwater High have the option to transfer schools or participate in extracurricular activities at Strayhorn and Independence High Schools. Accordingly, extracurricular activities are technically "available" to all students.  Practically, however, this availability is illusory.  By canceling all extracurricular activities at Coldwater High, the District's only predominantly African American high school, the District has erected a significant barrier to extracurricular participation by African American students – the requirement that a student must either transfer and travel to another school to participate, or remain at Coldwater High School and travel to a different school to participate.  To the extent it has not already, this barrier will no doubt decrease integration in the participation of

---

[11] *See Everett v. Pitt Cty. Bd. of Educ.*, 788 F.3d 132, 148–49 (4th Cir. 2015) (noting district did not impose "financial barriers to participation"); *see also Taylor v. Ouachita Par. Sch. Bd.*, No. Civ. 66-12171, 2012 WL 4471643, at *7 (W.D. La. Sept. 27, 2012) (noting "[t]he School Board has not created any barriers which would deter or prevent a student from participating in an activity of his or her choice.").

[12] *Keyes v. Sch. Dist. No. 1*, 895 F.2d 659, 666 (10th Cir. 1990); *see also Gray v. Lowndes Cty. Sch. Dist.*, 900 F.Supp.2d 703, 708–09 (N.D. Miss. 2012) (considering integration of extracurricular activities); *United States v. Caldwell Par. Sch. Bd.*, No. 71-CV-16751, 2011 WL 2634086, at *2 (W.D. La. July 5, 2011) (same).

extracurricular activities in the District. Additionally, the District's cancelation of extracurricular activities at Coldwater High has necessarily created an inequality of financial support provided to extracurricular activities, such that the predominantly white high schools are now the only schools receiving extracurricular funding.

Under these circumstances, the Court concludes that the cancelation of extracurricular activities at Coldwater High School has the effect of making extracurricular activities unavailable to students on the basis of their race.[13] Because such cancelation reduces desegregation or reinforces the existence of a dual system, it may be properly enjoined.

### 2. Scope of Injunction

Having found that the cancelation of the extracurricular activities amounts to unconstitutional segregation, the Court must fashion injunctive relief which will achieve the greatest degree of practicable desegregation. In this regard, the obvious remedy for a wrongful cancelation of extracurricular activities is the immediate reinstitution of all extracurricular activities. Such a remedy is appropriate in this case. Accordingly, the District will be ordered to immediately re-start all extracurricular programs at Coldwater High.[14]

### B. Sanctions

The plaintiffs have moved for civil contempt on the grounds that the cancelation of the extracurricular activities at Coldwater High violated the 1970 desegregation order. Doc. #57.

---

[13] In reaching this conclusion, the Court notes that it is no answer to say that a small number of white students may be similarly impacted. *See generally United States v. Hendry Cty. Sch. Dist.*, 504 F.2d 550, 554 (5th Cir. 1974) ("We must also ensure that the burdens of desegregation are distributed *equally* among all classes of citizens.") (emphasis added); *United States v. State of Louisiana*, 718 F.Supp. 499, 514 (E.D. La. 1989) ("At a minimum, funding reductions should not disproportionately affect black students or the PBIs [*predominantly* black institutions].").

[14] The Court is aware that issues with scheduling may limit the interscholastic opportunities for athletics. Notwithstanding this limitation, which is of the District's own making, the District must immediately take all reasonable steps to ensure that students at Coldwater High are afforded the same extracurricular opportunities as the students at the District's other schools.

"A district court has the inherent authority to impose sanctions in order to control the litigation before it. The court may also use that power to sanction conduct if it is in direct defiance of the sanctioning court or constitutes disobedience to the orders of the Judiciary." *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (internal quotation marks and citations omitted). "It is well-settled that a federal court, acting under its inherent authority, may impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct." *In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008). Even in the absence of bad faith, a court may hold a party in civil contempt. *See United States v. City of Jackson*, 359 F.3d 727, 735 n.25 (5th Cir. 2004) ("Our circuit … has consistently held that good faith is not a defense to a finding of civil contempt.").

### 1. Civil Contempt

To justify a finding of civil contempt, a "movant must establish by clear and convincing evidence that (1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order." *Id*. at 731. "Once the movant has shown a prima facie case, the burden falls on the violating party to 'show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the ... order." *Little Tchefuncte River Assoc. v. Artesian Util. Co., Inc.*, 155 F.Supp.3d 637, 657 (E.D. La. 2015) (quoting *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987)).

### a. Prima Facie Case

There is no dispute that the 1970 desegregation order was, and continues to be, in effect, and that it mandated specific conduct by the District. In arguing that the District violated the

1970 desegregation order, the plaintiffs contend that the canceling of extracurricular activities at Coldwater High violates the 1970 desegregation order because such "eliminate[d] interscholastic sports only at [the] predominantly black Coldwater Attendance Center High School." Doc. #58 at 3. The District responds:

> There has been no discrimination or segregation in this case and no violation of the 1970 Court Order as all black students were given an opportunity to transfer to Strayhorn or Independence and no black student was discriminated against or segregated because of their race in this decision to stop athletic activities at Coldwater High. Moreover, the District has made an effort to request eligibility for white students with MHSAA.

Doc. #72 at 7.

The 1970 desegregation order expressly prohibits segregation in the offering of athletics and other extracurricular activities. And, as explained above, the cancelation of extracurricular activities at Coldwater High resulted in segregation in the offering such extracurricular activities. Accordingly, the Court finds by clear and convincing evidence that the cancelation of extracurricular activities at Coldwater High violated the 1970 desegregation order.

### b. Mitigating Circumstances

Although there is no exhaustive list of mitigating circumstances which would excuse a violation of a court order, courts have generally considered whether the cause of the violation was beyond the control of the defendant. *See In Re Unclaimed Freight of Monroe, Inc.*, 244 B.R. 358, 366 (Bankr. W.D. La. 1999) (where order required production of documents, "[t]he destruction of records could possibly be a mitigating circumstance, had they been destroyed by a fire or flood").

The District contends that it canceled athletics to avoid a potential fine if Coldwater High closed and because it "did not see the wisdom in having students try-out and practice for teams and squads that could be non-existent in two months." Doc. #72 at 4–5. In essence, the District

argues that its "good faith" assumption the school would close amounts to a mitigating circumstance. The Court summarily rejects this argument.

A party is not entitled to assume that a motion will be granted.[15] *See Greenwood Expls. Ltd. v. Merit Gas & Oil Corp.*, 837 F.2d 423, 426–27 (10th Cir. 1988) ("The only reasons they offer for their behavior are that they assumed a substantial continuance would be granted ... and that they did not receive a copy of [a court order] …. These are not explanations; they are only excuses."); *see also Belofsky v. Gen. Elec. Co.*, 1 F.Supp.2d 504, 508 (D.V.I. 1998) ("Counsel surely could not have assumed that plaintiff's motion to reconsider would be granted ...."). If a party can violate a court order merely by asking to modify the order, court orders would become virtually meaningless. Even if the District's assumption that the Court would approve its decision to close Coldwater High could serve to justify the District's cancelation of Coldwater High's athletics programs, no mitigating circumstance has been offered for the cancelation of the non-athletic extracurricular activities.[16] Under these circumstances, the Court concludes that no mitigating circumstances justify withholding a finding of contempt for the District's violation of the 1970 desegregation order.

---

[15] To the extent the District canceled the athletic extracurricular activities in presumed anticipation that the Court would grant its motion to modify, although no court approval had been granted, the Court deems this indicative of the District's flippant disregard for orders of this Court, from the District's unwarranted assumption that it could take any action without court approval to its apparent failure to have appropriate procedures in place to ensure that it fully complied with the 1970 order.

[16] The Court acknowledges that Scoggin testified the cancelation of the non-athletic extracurricular activities was done by the Coldwater High principal without Scoggin's or the Board's approval or knowledge. However, a defendant may be held in contempt for the acts of an employee acting within his or her authority. *See Black Diamond Coal Mining Co. v. Local Union No. 8460, United Mine Works of Am.*, 597 F.2d 495 (5th Cir. 1970) ("The Union can be held in contempt ... if the strike was conducted or encouraged ... by its agents acting within their apparent authority, or by those whose acts the Union can be held to have ratified by its inaction."). Also, the Court finds Scoggin's testimony on this matter incredible, given Shead's testimony that, as early as August 2016, Scoggin informed the Board that Coldwater High would have no extracurricular activities, and Scoggin's admission that he learned of the principal's action before the hearing but took no action to re-start the extracurricular programs.

### c. Substantial Compliance

To show substantial compliance, a defendant must show that it took "all the reasonable steps within [its] power to insure compliance with the order[]." *Alberti v. Klevenhagen*, 610 F.Supp. 138, 141 (S.D. Tex. 1985) (quoting *Mobile Cty. v. Purvis*, 703 F.2d 580 (11th Cir. 1983)). The District has not argued substantial compliance with regard to the cancelation of extracurricular activities and the Court finds none.

### d. Summary

The plaintiffs have made a prima facie showing of civil contempt as to the cancelation of extracurricular activities at Coldwater High. The District has failed to show mitigating circumstances or substantial compliance. Under these circumstances, the Court finds the District in civil contempt for violating the 1970 desegregation order's requirement that extracurricular activities in the District be desegregated.

## 2. Appropriate Sanctions

Having found the District in civil contempt for its cancelation of Coldwater High's extracurricular activities, the Court turns next to the appropriate sanction. The plaintiffs ask this Court to issue sanctions in the form of: (1) dismissal of the motion to modify; (2) costs and attorney's fees; and (3) an order "requiring the Defendants to immediately reinstate interscholastic Sports and extracurricular activities."[17]

"Civil contempt can serve two purposes, either coercing compliance with an order or 'compensating a party who has suffered unnecessary injuries or costs because of contemptuous conduct.'" *In re Bradley*, 588 F.3d 254, 263 (5th Cir. 2009) (quoting *Travelhost, Inc. v.*

---

[17] The plaintiffs' memorandum mentions that "assessing a fine for contempt of court" would be an "appropriate" sanction. Doc. #58 at 15. However, neither the plaintiffs' memorandum nor their motion actually asks for assessment of a fine. Regardless, the Court declines to issue a fine because the plaintiffs have not argued how such a sanction would act as a compensatory or coercive measure.

*Blandford*, 68 F.3d 958, 961–62 (5th Cir. 1996)) (internal alterations omitted). "[A] court is obliged to use the least possible power adequate to the end proposed." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quoting *United States v. City of Yonkers*, 856 F.2d 444, 454 (2d Cir. 1988), *rev'd sub nom. on other grounds by Spallone v. United States*, 493 U.S. 265 (1990)).

### a. Dismissal of the Motion to Modify

In their Extracurricular Motion, the plaintiffs ask the Court to dismiss the motion to modify without prejudice and to prohibit "the Defendants from refiling their Motion until they first come into compliance with the 1970 desegregation order." Doc. #58 at 15. The District's response does not expressly address this request. However, in response to the Reporting Motion, addressed below, the District argues that dismissing the motion, which represents "a beneficial change for its students," would "punish the very students Plaintiffs purport to represent." Doc. #51 at 3.

As an initial matter, the Court rejects as unsupported the conclusory assertion that the requested modification represents a "beneficial change" for the District's students. Indeed, the impact of the proposed change, actual and potential, is a major issue in this litigation.

Turning to the merits of the plaintiffs' request, the Court finds guidance in *Harris v. City of Philadelphia*, 47 F.3d 1311 (3d Cir. 1995), a Third Circuit case with strikingly similar facts. In *Harris*, the Third Circuit considered the dismissal of a motion to modify a consent decree governing the City of Philadelphia's prisons as a sanction for the City of Philadelphia violating the consent decree. The Third Circuit determined that, as framed, the dismissal sanction was a punitive sanction beyond the authority of civil contempt. *Id*. at 1329. In reaching that conclusion, the Third Circuit noted that the district court could have used dismissal of the motion to modify as a coercive sanction but failed to do so because the sanctions order "had no

provision explicitly permitting the City to refile the motion" upon compliance with the consent decree. *Id.*

Here, in light of the seriousness of the District's violation, as well as the District's history of non-compliance with the 1970 desegregation order, the Court concludes that dismissal without prejudice of the motion to modify represents an appropriate coercive sanction. The Court will dismiss the District's motion to modify without prejudice, and the District may renew the motion if it chooses after bringing itself into full compliance with the 1970 desegregation order.[18]

### b. Attorney's Fees and Costs

"Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt." *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977). Accordingly, "[d]iscretion, including the discretion to award attorneys' fees, must be left to a court in the enforcement of its decrees." *Id.* Such an award, which may include costs,[19] may be justified as a coercive or compensatory sanction. *Id.*

The Court concludes that attorney's fees and costs represent an appropriate compensatory sanction for the District's cancelation of extracurricular activities at Coldwater High, which sanction resulted from the plaintiffs' filing and pursuing a motion challenging such action before this Court. Within fourteen days of the issuance of this order, the plaintiffs will be permitted to submit a notice setting forth their reasonable attorney's fees and costs associated with the Extracurricular Motion.

---

[18] The District must also fully comply with all mandates of the instant order before renewing its motion. Although the Court has determined that the District's motion to modify will be dismissed, the parties are directed to continue to engage in discovery on the issues presented in the motion under the discovery schedule set forth in this Court's November 10, 2016, order. Both issues covered by the discovery order – the request to close Coldwater High and the District's compliance with the 1970 desegregation order – remain active in this litigation.

[19] *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990) ("[F]ederal courts have inherent power to police themselves by civil contempt, imposition of fines, the awarding of costs and the shifting of fees.")

### c. Requiring Extracurricular Activities at Coldwater High

For the reasons above, the Court concludes that an injunction requiring the District to reinstitute extracurricular activities at Coldwater High is also appropriate as a sanction for the District's wrongful cancelation of such activities. *See Augustus* 507 F.2d at 156 ("The desegregation order is ... within the jurisdiction of the court and the court may enter an injunction against any individual who interferes with the proper execution of that order."). Such will be ordered.

## V
## Reporting Motion

In their Reporting Motion and their related November 10, 2016, memorandum, the plaintiffs seek sanctions, in the form of civil contempt, for the District's filing years of incomplete reports. *See* Doc. #48; Doc. #84. The reporting violations are also the subject of three separate orders to show cause. Doc. #39; Doc. #78; Doc. #86.

### 1. Finding of Civil Contempt

### a. Prima Facie Showing

There is no question that the 1970 desegregation order has been in effect since its entry and that it required specific conduct by the District – the filing of complete reports including information on teachers and construction within the District. Furthermore, it is clear that the District violated the order by filing sixteen years of reports without the requisite teacher information, and by filing at least three years[20] of reports without the requisite construction

---

[20] The District argues that the renovation work performed in 2012, which included roof work and the replacement of a canopy, did not qualify as "construction" or "expansion" and, therefore, did not need to be reported. Although the 1970 order did not define the term, the Oxford English Dictionary defines "construction" as "[t]he action of framing, devising, or forming, by the putting together of parts; erection, building." OED, *Oxford English Dictionary*, construction, *n.*, http://www.oed.com/view/Entry/39899?redirectedFrom=construction& (last visited Dec. 5, 2016). The Court finds that the replacement of a canopy fits within this definition. However, in recognition of the gray area inhabited by the 2012 renovations, the Court will not hold the District in contempt for the 2012 report. In the future,

information.[21]   Accordingly, the question becomes whether a finding of contempt should be denied based on mitigating circumstances or substantial compliance with the 1970 order.

### b.  Mitigating Circumstances

The District argues that a finding of civil contempt is inappropriate because the missing information was eventually provided to the plaintiffs and the Court, and because the plaintiffs suffered no prejudice from the reporting violations.  However, subsequent compliance and the absence of damages are relevant to the issue of sanctions, not a finding of contempt.  *See Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F.Supp.2d 247, 254–55 (D. Conn. 2002) ("Atlas is found to have been in contempt .... However, as no damages have been claimed or shown … and the steps now taken by Picard … will ensure that future 'inadvertent' violations do not occur, the Court finds that no imposition of sanctions is appropriate at this juncture."); *see generally Jackson*, 359 F.3d at 730–32 (affirming finding of contempt despite fact defendant subsequently complied with court order).   Accordingly, the Court finds no mitigating circumstances to justify withholding its contempt power.

### c.  Substantial Compliance

The record shows that in 2000, the District assigned the reporting function to an employee who omitted key information for nearly twenty years.[22]   There is no evidence the

---

the Court suggests that the District err on the side of inclusion in reporting construction to avoid challenges to the completeness of its reports as those now before the Court.

[21] In responding to the relevant orders to show cause, the District suggests that the 1970 desegregation order was not violated by the incomplete reports because the information was eventually provided to the plaintiffs.  The Court summarily rejects this argument.  As explained above, the 1970 desegregation order required the submission of annual reports containing specific information.  The annual reports submitted by the District omitted required information.  Accordingly, the 1970 desegregation order was violated at the time each incomplete report was filed.  *See Ruiz v. McCotter*, 661 F.Supp. 112, 144 (S.D. Tex. 1986) ("Because TDC *procrastinated* in obeying a court order requiring immediate action, a finding of contempt in this regard is compelled.") (emphasis added).

[22] This employee information is based on the affidavit of one of the District's attorneys of record, who, as noted above, offers no foundation in his affidavit for his knowledge of such statements before 2008.  Given this, the Court discredits the District's excuse based on the employee for the time period before 2008.  *See generally MLP Tech., Inc. v. LifeMed ID, Inc.*, No. 5:13-cv-00909, 2013 WL 6243943, at *1 (N.D. Ohio Dec. 3, 2013) ("Although some

employee was trained on the reporting requirements, or that the District took any steps to ensure that the employee included the required information. Regardless, the Court finds inexcusable that the absence of the requisite information was overlooked or not discovered by the District or its counsel for nearly two decades. Whatever substantial compliance in this situation may look like, the District's actions fall well short of such a threshold.

### d. Contempt

In summary, the District violated the 1970 desegregation order by submitting sixteen years of incomplete reports. The District's violations are neither mitigated by relevant factors nor excused by substantial compliance. Accordingly, the Court must hold the District in civil contempt for its reporting violations.

### 2. Appropriate Sanction

Having found the District in civil contempt for its reporting violations, the Court turns to the determination of an appropriate sanction. For the incomplete reports, the plaintiffs ask this Court to issue sanctions in the form of: (1) costs, including attorney's fees; (2) an order "dismissing" the motion to modify; (3) an order requiring the submission of complete reports; and (4) an order allowing the plaintiffs to conduct discovery.

### a. Costs and Attorney's Fees

The Court concludes that an award of costs and reasonable attorney's fees represents an appropriate compensatory sanction for the years of reporting violations.[23]

---

courts have applied the personal knowledge requirement to motions other than summary judgment, others have determined that declarations or affidavits not meeting the personal knowledge requirement shall be given proper weight in their consideration rather than be ignored.") (collecting cases).

[23] With regard to the missing teacher data, the District argues that "any burden of filing a Motion to compel the data was brought on by Plaintiffs who never gave the District a chance to respond to their June 22, 2016 demand." Doc. #51 at 5. The District cites no authority, and this Court has been unable to find any, which stands for the proposition that an award of attorney's fees depends on the movant having provided the contemnor an opportunity to comply with the order.

### b. "Dismissing" Motion to Modify Attendance Zones

Next, the plaintiffs, citing case law regarding dismissals for failure to prosecute under Rule 41, ask this Court to "dismiss" with prejudice the District's motion to modify the attendance zones. *See* Doc. #49 at 10–11; Doc. #84 at 7. In the alternative, the plaintiffs ask the Court to "dismiss' the motion without prejudice until such time as the District has "fully complied with all terms and provisions of the August 4, 1970 Order." Doc. #84 at 7–8; Doc. #49 at 11.

As an initial matter, dismissal of the motion to modify with prejudice would neither compensate the plaintiffs for the reporting violation (or any violation) nor coerce the District into compliance with the 1970 desegregation order. *Harris*, 47 F.3d at 1329. Accordingly, such relief will not be granted under this Court's civil contempt power. *Id*.

As for the plaintiffs' request to dismiss the motion without prejudice until such time as the District complies with the 1970 desegregation order, the Court finds such relief appropriate. While the Court has already determined that such relief will be granted in conjunction with the Extracurricular Motion, it also will be granted for the District's reporting violations.[24]

### c. Submission of Missing Information

The plaintiffs ask this Court to order the District to submit reports containing the missing required information. The Court believes this relief would assist in compensating the plaintiffs for the reporting violations and would help ensure compliance with the 1970 desegregation order's reporting requirements in the future. *See generally Fla. Steel Corp. v. NLRB.*, 648 F.2d 233, 239 (5th Cir. 1981) ("[T]he proper aim of judicial sanctions for civil contempt is full remedial relief.") (internal quotation marks omitted). Accordingly, the District will be ordered to

---

[24] The Court's decision in this regard is not intended to double the sanctions imposed on the District but rather to clearly delineate what sanctions it deems appropriate for each violation such that each stands independently of the other.

provide the plaintiffs, within fourteen days of the issuance of this order, with supplemental reports for the years 2000–2015 including all information required by the 1970 desegregation order. To ensure future reporting accuracy, such reports will also be required to: (1) include a statement of compliance with the 1970 desegregation order; (2) be signed by the superintendent and counsel of record for the District; and (3) be posted on the District's website in a manner such that they may easily be found. Future annual reports will be required to comply with these three requirements until such time as the Court finds that the District has displayed adequate adherence to the Court's reporting requirements.

### d. Allowing Plaintiffs to Conduct Discovery

Finally, the plaintiffs seek an order allowing for a discovery period in this action. This Court has already allowed discovery in this action and will not alter its decision in this regard. Accordingly, this request will be denied as moot.

**VI**
**Conclusion**

For the reasons above:

1.  The District's motion to strike [89] is **DENIED**.

2.  The plaintiffs' "Motion for Further Relief Pursuant to Desegregation Order, and to Compel Defendants to Reinstitute Sports and Extracurricular Activities at Coldwater Attendance Center High School" [57] is **GRANTED** such that:

    a.  The District's motion to modify attendance zones [12] is **DISMISSED without prejudice** to its renewal once the District has come into full compliance with the 1970 desegregation order and the mandates of this order;

28

b.      The District must pay attorney's fees and costs associated with the Extracurricular Motion and, within fourteen (14) days of the issuance of this order, the plaintiffs may submit a notice setting forth their costs and reasonable attorney's fees associated with seeking reinstatement of athletics and other extracurricular activities;[25] and

c.      The District must immediately reinstate athletics and other extra-curricular activities at Coldwater High.

3.    The plaintiffs' "Motion for Supplemental Relief Pursuant to Desegregation Order, and to Compel Defendants to File Supplemental Reports Report [sic] That Are in Compliance with the August 4, 1970 Desegregation Order" [48] is **GRANTED in Part and DENIED in Part** such that:

a.      The District must pay attorney's fees and costs associated with the Reporting Motion and, within fourteen (14) days of the issuance of this order, the plaintiffs may submit a notice setting forth their costs and reasonable attorney's fees associated with enforcing the 1970 desegregation order's reporting requirements;[26]

b.      Within fourteen (14) days of the issuance of this order, the District must provide the plaintiffs with supplemental reports for the years 2000–2015 including all information required by the 1970 desegregation order. Such reports shall also: (1) include a statement of compliance with the 1970 desegregation order; (2) be signed by the superintendent and counsel of

---

[25] If no notice is filed by the plaintiffs within fourteen days, the Court will make its own determination as to the amount of reasonable fees and costs to be awarded.

[26] If no notice is filed by the plaintiffs within fourteen days, the Court will make its own determination as to the amount of reasonable fees and costs to be awarded.

the record for the District; and (3) be posted on the District's website in a manner such that they may easily be found. These additional requirements will apply to all future reports until such time as the Court finds the District has demonstrated adequate adherence to the Court's reporting requirements.

c.     To the extent the Court has already allowed discovery, the request for discovery is denied as moot.

**SO ORDERED**, this 7th day of December, 2016.

/s/ **Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**