IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

**KELLY MCNEAL, et al.**                                                                 **PLAINTIFFS**

**V.**                                                                                  **NO. 2:70-CV-29-DMB**

**TATE COUNTY SCHOOL
DISTRICT, et al.**                                                                       **DEFENDANTS**

**ORDER**

This school desegregation case is before the Court on the Tate County School District's petition to close Coldwater High School. For the reasons explained below, the School District's petition will be conditionally granted subject to its ability to show Coldwater's closure will not place an inequitable transportation burden on the School District's African-American students.

**I
Relevant Procedural History**

Since August 4, 1970, the Tate County School District has operated under a desegregation order issued by this Court.[1] Doc. #12-1. On September 28, 2010, at the School District's unopposed request, the Court amended the desegregation order to modify the School District's three attendance zones. Doc. #4. On April 1, 2016, the School District again sought to modify the attendance zones so that it could close Coldwater High School, one of its three high schools.[2] Doc. #12. Following various additional motions, a period of discovery, and the Court's finding that the School District had violated the 1970 desegregation order by canceling extracurricular activities at Coldwater and by failing to comply with annual reporting requirements, the Court

---

[1] A detailed procedural history is set forth in the Court's December 7, 2016, memorandum opinion and order. Doc. #94.

[2] In addition to Coldwater High School, the School District operates Strayhorn High School and Independence High School.

ultimately dismissed the motion to modify without prejudice as a "coercive sanction." Doc. #94 at 22–23. However, the Court's dismissal order provided that the School District "may renew the motion if it chooses after bringing itself into full compliance with the 1970 desegregation order," including its reporting requirements.[3] *Id.* at 23.

On September 14, 2021, the School District filed a "Petition for Closure of Coldwater High School" ("Closure Petition").[4] Doc. #123. Seeking approval of the closure "beginning in the 2022-2023 school term," the School District "brings the [Closure] Petition at the direction of [Mississippi] House Bill 669 and upon its own initiative recognizing it is in the best interest of the students of the Tate County School District to close Coldwater." *Id.* at 2–3, 17.

After the filing of multiple other motions related to the Closure Petition,[5] the plaintiffs were granted leave to file an amended response and the School District was granted an extension to file a reply. Doc. #142. The School District replied on June 20, 2022, Doc. #144, and the plaintiffs docketed their amended response the next day, Doc. #145.[6]

---

[3] The Court also directed the parties "to continue to engage in discovery" regarding both the closure of Coldwater and the School District's compliance with the 1970 desegregation order. Doc. #94 at 23 n.18.

[4] Pursuant to the Local Rules, the Court construes the petition as a motion. *See* L.U. Civ. R. 7(b) ("Any written communication with the court that is intended to be an application for relief or other action by the court must be presented by a motion in the form prescribed by this Rule."). The format of the petition violates the Local Rules in several ways because it exceeds four pages, contains legal argument and citation, does not advise whether it is opposed, and is not accompanied by a memorandum brief. *See* L.U. Civ. R. 7(b)(2), (4), (10). However, in the interest of addressing the merits of the issues before the Court and since the plaintiffs did not object to the School District's failure to abide by the Local Rules, the deficiencies are excused in this instance.

[5] Some of these motions were rendered moot. Doc. #142.

[6] The Court deemed as controlling the amended response attached as an exhibit to the plaintiffs' motion for leave but directed the plaintiffs to file it as a separate docket item no later than June 17, 2022. Doc. #142 at 3. The plaintiffs did not separately docket the amended response until four days after the June 17 deadline. Although the plaintiffs' counsel e-mailed the Court that he was having difficulty with the electronic filing system, he did not do so until June 19. Again, in the interest of reaching the petition's merits and because the substance of the amended response was made known to the School District at the time it was attached to the plaintiffs' motion for leave, the Court excuses the plaintiffs' four-day delay in separately docketing the amended response.

## II
## Standard of Review

Where, as here, there has been a finding of de jure segregation, a court "must exercise its broad equitable power to review and modify proposed remedies which are intended to create and maintain a unitary school system." *Flax v. Potts*, 567 F. Supp. 859, 861 (N.D. Tex. 1983). In considering whether to implement a proposed change to a desegregation plan, a court

> must decide only whether the choice violates the Constitution or federal law. To make that determination, federal courts ask only whether the proposed modification fails to further desegregation or places an inequitable transportation burden on black students. So long as neither answer is in the affirmative, [the court] must defer to the expertise of school boards in decisions of this nature.

*United States v. Mississippi (Choctaw Cnty. Sch. Dist.)*, 941 F. Supp. 2d 708, 714–15 (N.D. Miss. 2013) (quoting *Anderson ex rel. Anderson v. Canton Mun. Separate Sch. Dist.*, 232 F.3d 450 (5th Cir. 2000)) (internal alterations omitted).

In evaluating whether a plan furthers desegregation, a court should consider the six factors set forth in *Green v. County School Board*, 391 U.S. 430, 435 (1968). *See Lee v. Butler Cnty. Bd. of Educ.*, 183 F. Supp. 2d 1359, 1363 (M.D. Ala. 2002) (noting "the *Green* factors [are] the areas of school operation which are traditionally held as indicators of a desegregated (or not) school system"). These factors are (1) student assignment, (2) faculty, (3) staff, (4) transportation, (5) extracurricular activities, and (6) facilities. *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 298 (5th Cir. 2008). While this standard of review for modifications places great trust in a school district, a court must still "examine each of the proposed amendments in detail, keeping in mind the ultimate goal of achieving a unitary school system which offers quality education to all students." *Flax*, 567 F. Supp. at 861. This is true even when the requested relief is unopposed. *Id.* at 861–75 (evaluating the impact on desegregation of joint proposed desegregation plan). And where the record is insufficient to evaluate proposed modifications, a court must ensure the

adequacy of the record. *See United States v. Bd. of Educ. of Baldwin Cnty.*, 417 F.2d 848, 850 (5th Cir. 1969) (directing hearing on proposed desegregation plan where record was "stale").

## III
## Analysis

The School District argues that "closure of Coldwater is appropriate due to its small student population, age of its facility, the impact on the overall unitary status of the District by the closure, greater access to extra-curricular activities for transferring students and an opportunity for academic growth for those students." Doc. #123.

In response, the plaintiffs submit that the School District "built, staffed, purchased equipment and furniture, and supplies, and opened Strayhorne [sic] High School, without Court approval" and that the School District's actions with respect to Strayhorn have resulted in the need to close Coldwater. Doc. #138 at 1. Arguing that the record in this case is stale, the plaintiffs ask "to conduct discovery … to determine whether or not [the School District's] actions are aimed at moving [it] toward a unitary school system, or whether or not this is just the latest scheme designed to evade the desegregation Order." *Id.* at 3, 6. To support their arguments, the plaintiffs submitted several affidavits detailing the conditions at Coldwater and alleged discrimination prior to 2016,[7] addressing whether the School District's board voted to close Coldwater,[8] and alleging students on specific streets were incorrectly transported to schools other than Coldwater.[9]

The School District replies that the plaintiffs' "vague and/or outdated allegations" do not "undermine the fact that the closure of Coldwater results in a contribution to the establishment of a unitary system of education;" in the nine months the Closure Petition has been pending, "not a

---

[7] *See* Docs. #145-1 to #145-5, #145-17, #145-18.
[8] *See* Docs. #145-6, #145-8, #145-14.
[9] *See* Docs. #145-7, #145-9 to #145-13, #145-15, #145-16.

4

single piece of written discovery in any form or request for a deposition has been made;" and the 1970 order did not require approval of the construction of Strayhorn but rather just "approval of the establishment of new attendance zone lines." Doc. #144 at 1–3.

### A. Discovery

With respect to the plaintiffs' argument for discovery,[10] the only specific discovery the plaintiffs seem to request concerns "why [the School District] chose to build a new school at Strayhorn rather than at Coldwater." Doc. #138 at 6.

The Court's 1970 desegregation order provided that "[a]ll school construction, school consolidation, and site selection … in this system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented." Doc. #12-1 at 7. The 1970 order did not include any specific language requiring the School District to obtain approval for any new construction. Thus, the building of Strayhorn without Court approval did not violate the 1970 order.[11] Even if approval was required, the Court's 2010 order specifically approving new attendance zones to include Strayhorn implicitly granted such approval. *See* Doc. #4. And as pointed out by the School District, while the affidavits submitted by the plaintiffs include specific statements that certain students who should have been attending Coldwater were not, the plaintiffs offer no proof that each child was not assigned to the school he or she attended.[12] Doc. #144 at 4. Because the plaintiffs have not shown a need for the discovery they seek (or that

---

[10] Such request is not proper in response to the Closure Petition. *See* L.U. Civ. R. 7(b)(3)(C) ("A response to a motion may not include a counter-motion in the same document. Any motion must be an item docketed separately from a response.").

[11] The 1970 order requires the School District's annual reports to include "a brief description of any present or proposed construction or expansion of facilities." Doc. #12-1 at 9. While the School District's annual reports did not provide a brief description of the present or proposed construction of Strayhorn or the completion of its construction in 2005, the plaintiffs did not raise the issue of the School District's report failures until the School District filed its 2016 petition seeking Coldwater's closure. *See* Doc. #37.

[12] In fact, each of the specific streets listed in the affidavits falls *outside* Coldwater's attendance zone.

more information is required beyond that contained in the annual reports filed by the School District), their request for discovery is denied. The Court will decide, based on the present record, whether the *Green* factors weigh in favor of granting the Closure Petition.

### B. *Green* Factors

With respect to each of the six *Green* factors, the School District argues the closure of Coldwater "will only improve the District's unitary system of education." Doc. #123 at 6. The plaintiffs do not present specific arguments related to any of the *Green* factors in their response, much less any arguments refuting the School District's assertion that Coldwater's closure improves its unitary system.

### 1. Student assignment

The School District argues that Coldwater's "current demographics do not closely mirror the overall District high school demographics" and the closure "and resulting transfer of students will only serve to promote a more diverse student body in the District's remaining high schools." *Id.* at 6. Relying on the affidavit of Alee Dixon,[13] the School District represents that, as of May 2021, its students in grades seven through twelve were 56.03% white and 43.97% non-white; Coldwater's student population was 20.97% white and 77.22% non-white; Independence's student population was 54.97% white and 45.03% non-white; and Strayhorn's student population was 77.02% white and 22.99% non-white. *Id.* at 6–8; Doc. #123-3 at 1–2. The School District further provides data regarding the anticipated demographics of both Strayhorn and Independence under two separate proposed redistricting plans should Coldwater be allowed to close. Doc. #123 at 8–9; Doc. #123-4.

---

[13] Dixon is "the current Superintendent of the Tate County School District and ha[s] served the District as either a teacher or school administrator for more than 20 years." Doc. #123-3 at 1.

6

Based on the statistical information provided by the School District, neither Coldwater nor Strayhorn currently have student populations that mirror the average demographics of the students in grades seven through twelve of the entire School District. And under either proposed redistricting plan, the anticipated demographics of Strayhorn and Independence more closely resemble the current overall demographics of the School District. Accordingly, the Court finds the student assignment factor weighs in favor of allowing the closure of Coldwater. *See Harris v. Crenshaw Cnty. Bd. of Educ.*, 968 F.2d 1090, 1095 (11th Cir. 1992) (affirming closure of school with "disproportionately high" African-American population and reassignment of students to school with "disproportionately low" African-American population because "combining the two schools w[ould] accomplish greater desegregation").

### 2. Faculty and staff

With respect to the faculty and staff, the School District represents that Coldwater's teachers—53% of whom are African-American—"will be transferred to the remaining high schools … with placement to occur based on need and teacher certification" and this reassignment will "serve to solidify a unitary staff and teacher composition." Doc. #123 at 9–10. In addition to representing that Coldwater's faculty is "53% African American," Dixon attests that Strayhorn's staff is 73% white and Independence's staff is 75% white. Doc. #123-3 at 3.

The 1970 order provides that staff will be assigned "so that the ratio of black to white teachers in each school, and the ratio of other staff in each, are substantially the same as each such ratio is to the students in attendance at said school." Doc. #12-1 at 4–5. Currently, while Strayhorn's 73% white staff is "substantially the same" as the 77% white student body, Independence's 75% white staff does not accurately reflect the approximately 55% white student body nor does Coldwater's 53% African-American staff reflect its 77% non-white student body.

7

Thus, it appears that reassigning Coldwater's staff—especially to Independence—will only further the unitary system by bringing the School District closer to compliance with the 1970 order. This factor also weighs in favor of Coldwater's closure.

### 3. Transportation

The School District argues Coldwater's closure "will only serve to continue Tate's unitary transportation system[ and o]n average, the commute for Coldwater High transferring students will only be 15-20 minutes longer than any current commute." Doc. #123 at 10. The School District represents in its most recent status report that "[t]he transportation system of the school district is desegregated completely, with the exception of a few remote areas, where only one race lives on the school bus route." Doc. #137 at 372. Based on this representation, it does not appear that Coldwater's closure would negatively impact the transportation system's desegregated status. But given that the majority of students at Coldwater are African-American, that closing Coldwater might result in a 15-20 minute longer commute, and that the School District did not provide how long it takes for Coldwater's students to commute to Coldwater (particularly compared to how long the commute is for the students at the other high schools), the Court is concerned that closure may place an inequitable transportation burden on those students. So at this stage, the Court considers the transportation factor neutral but will require the School District to provide additional information to show that Coldwater's closure will not result in an inequitable transportation burden.

### 4. Extracurricular activities

The School District argues that it "already offers a unitary extra-curricular activity system;" the other high schools "offer a robust array of extracurricular activities, all of which Coldwater's students will be allowed to enjoy;" and "multiple new programs will be available to Coldwater

8

students" after transfer because "[l]ow student populations have meant that organizations/activities like Theatre or Band were not feasible at Coldwater." Doc. #123 at 10. The Court agrees that the availability of additional activities to Coldwater students which are now not possible due to the size of Coldwater's population will further the unitary system. The extracurricular activities factor therefore weighs in favor of closure. *See Morales v. Shannon*, No. DR-70-CA-14, 2007 WL 2317177, at *7 (W.D. Tex. Aug. 9, 2007) (allowing modification of desegregation order to allow students to attend alternative school with more academic and extracurricular opportunities where "the lack of educational opportunity [at the original school was] a matter of numbers rather than racial discrimination").

### 5. Facilities

Because "Coldwater … was built in 1958" and the other two high schools "were completed in 2005," the School District argues "re-assignment of Coldwater students into better, more up to date facilities will be a benefit to those students" such that the facilities factor weighs in favor of closure. Doc. #123 at 10–11. Dixon's affidavit supports the same. Doc. #123-3 at 4. Since the Court agrees Coldwater's students will most likely benefit from attending high school in newer updated buildings and the plaintiffs have offered nothing to suggest otherwise, this factor also weighs in favor of allowing Coldwater's closure. *C.f. Valley v. Rapides Par. Sch. Bd.*, 702 F.2d 1221, 1224 (5th Cir. 1983) (affirming closure of "more modern" school where "of all the proposals offered," its closure could "best be expected to achieve the mandated conversion to a unitary system").

### 6. Additional factors

In addition to the *Green* factors, the School District argues other factors considered by courts weigh in favor of closure because (1) there are non-racial reasons for the closure because of

9

the "small student population, older facilities and the possibility of higher test scores for Coldwater students and more opportunities for extra-curricular participation;" (2) Coldwater is in "poor condition" compared to the other high schools; (3) the other high schools will not be overtaxed by the closure because both "are not filled to capacity and … are equipped to educate the students being transferred" while maintaining student/teacher ratios "within the ideal range;" (4) other alternatives—such as "[m]oving students from higher performing schools … to sparsely populated failing schools"—would not benefit the School District; (5) there will be "minimal" burden placed on African-American students and teachers; (6) other alternatives were considered but it was determined they "would not benefit the [School] District;" (7) moving students to "higher achieving high schools … will only serve to increase the potential performance of the transferring students;" and (8) "the District's finances will be positively impacted by the closure." Doc. #123 at 11–16.

As set forth in Mississippi Code § 37-7-315.1—the legislation resulting from House Bill 669—the factors considered in "determining the necessity to close Coldwater" include:

> (a) Coldwater High School has consistently and chronically underperformed, as determined by its grade designation under the statewide school accountability rating system, as determined by the State Board of Education for the last four (4) accreditation cycles as follows:
>
> > (i) Maintained a "F" accountability rating for the 2016, 2017, and 2018 school years; and
> >
> > (ii) Achieved a "D" accountability rating for the 2019 school year;
>
> (b) Coldwater High School has maintained an average annual enrollment of approximately one hundred (100) students for the last four (4) scholastic terms;
>
> (c) Coldwater High School's average annual student enrollment for the last four (4) scholastic terms represents less than four percent (4%) of the overall student enrollment for the Tate County School District;

> (d) Coldwater High School provides a limited selection of robust and advanced course offerings as part of its adopted curriculum; and
>
> (e) An assessment of Coldwater High School's graduation percentage rates and dropout percentage rates in comparison to the other remaining two (2) high schools throughout Tate County, the Senatobia Municipal School District and in surrounding counties.

Miss. Code Ann. § 37-7-315.1(1). Additionally, Dixon attests that "Strayhorn and Independence High currently are not filled to capacity and both schools are equipped to educate the students being transferred from Coldwater;" "[a]ssuming an even split of the current Coldwater student population," both Strayhorn and Independence would maintain student/teacher ratios "within the ideal range;" Strayhorn and Independence are "traditionally, 'B or C' level schools" and she believes moving Coldwater's students "to the higher achieving high schools … will only serve to increase the potential performance of the transferring students;" and she anticipates the School District "will save $145,000 annually by the closure" of Coldwater. Doc.#123-3 at 4–5.

The Court finds that the factors cited by the Mississippi Legislature in concluding the closure of Coldwater a necessity and the anticipated benefits of closure represented by Dixon further support the decision to close Coldwater. *See Harris*, 968 F.2d at 1098 (approving closure because it would create "a single school … that functions more economically …, offers more educational opportunities …, and is more integrated").

### 7. Summary

After considering the *Green* factors, the Court concludes that the impact of Coldwater's closure on student assignment, faculty, staff, extracurricular activities, and facilities all weigh in favor of allowing closure, with only the impact on transportation deemed neutral. The Court also concludes that consideration of additional factors, including the likely academic benefit to the students and financial benefit to the School District, weigh in favor of closure. Accordingly,

further recognizing that the School District needs time to adequately prepare for the upcoming school year, the Court will grant the petition to close Coldwater but conditionally. Given the Court's concern the closure may place an inequitable transportation burden on the African-American students, the granting of the petition will be conditioned on the School District providing additional information regarding the transportation burden on the students throughout the district.

## IV
## Conclusion

The Closure Petition [123] is **CONDITIONALLY GRANTED**. Within twenty-one (21) days of the entry of this order, the School District is directed to provide additional information regarding the average length of commute for the different student demographics in grades seven through twelve under the current attendance zones and under each proposed redistricting plan.

**SO ORDERED**, this 13th day of July, 2022.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**